Filed 9/23/20  Rudnick v. Rudnick CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| OSCAR RUDNICK, as Trustee, etc.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT RUDNICK,<br><br>Defendant and Appellant. | F079105<br><br>(Super. Ct. No. S-1500-PB-57626)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Robert S. Tafoya, Judge.

Gilmore Magness Janisse and David M. Gilmore for Defendant and Appellant.

Thompson Coburn, Richard G. Reinis and John L. Viola; Lynch & Lynch and Craig Lynch for Plaintiff and Respondent.

-ooOoo-

In proceedings regarding a family trust, as considered at length by this court in a separate appeal (*Rudnick v. Rudnick*, F077613), the trial court granted a petition by

respondent Oscar Rudnick (Oscar or the trustee) as the trustee of the Rudnick Estates Trust for final distribution and termination of the trust (the petition). Only one trust beneficiary had raised objections to the petition in the trial court; namely, appellant Robert Rudnick (Robert).[1] Most of his objections were withdrawn on the eve of hearing, but only after causing considerable expense and delay. In ruling on the petition, the trial court not only granted the trustee's petition but found Robert's objections were asserted in bad faith. Robert appealed from that order, and we recently affirmed the trial court's ruling, including the finding of bad faith. (See *Rudnick v. Rudnick* (Nov. 19, 2019, F077613) [nonpub. opn.].) While that appeal was still pending, Oscar as trustee made a motion in the trial court for an award of attorney fees and costs against Robert, which sums were incurred in having to respond to Robert's bad faith objections to the petition.[2] The trial court granted the motion, relying on multiple legal grounds to support the award of attorney fees. Robert now appeals from the order granting attorney fees and costs, arguing the trial court lacked jurisdiction to grant that relief while his appeal regarding the underlying petition was still pending, and, in any event, there was no statutory, contractual or other basis to award attorney fees. We find Robert's arguments wholly unpersuasive. As explained more fully below, not only did the trial court have jurisdiction to hear the motion, but it also had valid legal grounds for awarding attorney fees in this case. Accordingly, the order of the trial court awarding attorney fees and costs is hereby affirmed.

---

[1]　For convenience, we generally refer to the parties by their first names. No disrespect is intended.

[2]　For ease of expression, we sometimes refer to this motion as the motion for fees, the fee motion, or simply the motion.

<u>**FACTS AND PROCEDURAL HISTORY**</u>

**A. Summary of Background Events and History**

Because the background facts are the same in this appeal as in *Rudnick v. Rudnick*, *supra*, F077613, the following summary is restated from that case, in a slightly abridged form. Although somewhat lengthy, we reiterate the overall procedural and factual history to provide an adequate context to the trust, the recurring but unnecessary objections by Robert to the trustee's actions, and the parties' present attorney fee dispute.

**The 1937 Trust**

In 1937, Oscar and Libbie Rudnick[3] entered into an irrevocable trust agreement creating separate trusts for the benefit of each of their 11 children. The separate trusts each owned an undivided interest in various real property and businesses. All 11 trusts were managed as an integrated enterprise. We refer to this original trust arrangement as the 1937 trust.

In the early 1960's, many of the beneficiaries of the 1937 trust were entitled to a distribution of some or all of their trust assets. However, immediate distribution of assets was not feasible because of the nature of the assets and the beneficiaries' undivided interests in those assets. As the trial court put it, "[s]ince each beneficiary possessed an equal one eleventh interest in each asset it was nearly impossible to dispose of assets unless all eleven beneficiaries agreed to the terms of sale or distribution." At that time, a dispute arose between the successor cotrustees and several beneficiaries regarding how to proceed. In 1964, in settlement of the dispute, all the beneficiaries of the 1937 trust reached an agreement to create a new unified trust that would own, manage and liquidate the assets of the 1937 trust.

---

[3] Oscar and Libbie Rudnick were Robert's parents and the present trustee's (i.e., Oscar's) grandparents.

## Rudnick Estates Trust

In carrying out this objective, the beneficiaries executed the new trust agreement on January 24, 1965, thereby establishing the Rudnick Estates Trust (hereafter, the trust). As declared by the terms of the trust, its purpose was "to accomplish an orderly liquidation of all of the assets in the Trust Estate, and to provide for distribution of the proceeds therefrom to the beneficiaries hereof as quickly as reasonable prudence will permit." The trust also set forth a definite termination date. Unless it was terminated earlier by majority vote of beneficiaries or by distribution of all trust assets, the trust would terminate on December 31, 1974.

In seeking to facilitate an orderly liquidation of assets and distribution of proceeds, the trust provided greater flexibility by allowing a sale or other disposition of trust assets to be approved by a majority of the beneficiaries. In that regard, article "Seventh" of the trust stated the following: "Beneficiaries representing a majority of the corpus interests hereunder shall have the power to approve or disapprove any sale, exchange, or lease of any [t]rust asset. Ten (10) days notice of any such contemplated sale, exchange or lease shall be given by the Trustee to every beneficiary. Any beneficiary who does not give written notice to the Trustee that he objects to the proposed transaction within ten (10) days of the date the original notice was mailed, will be conclusively deemed to have approved said transaction. The Trustee shall not have power to enter into any such transaction unless and until such majority have expressly approved and/or by inaction have been deemed to have given their approval." In like manner, other significant actions such as amendment or termination of the trust and removal or appointment of a trustee could be accomplished by a majority of the beneficiaries.

The current trustee, Oscar, was elected by a majority of the beneficiaries more than 20 years ago to serve as trustee of the trust.

4.

**Our 1999 Opinion**

Although the trust contemplated liquidation of the assets and termination of the trust by December 31, 1974, due to various complications outlined in our 1999 opinion (*Rudnick v. Rudnick* (May 25, 1999, F027453) [nonpub. opn.]), that did not occur. As we observed in that 1999 case, all the beneficiaries by their conduct had unanimously agreed to extend the trust beyond 1974; however, they disagreed about the length of the extension and the terms of the extension. When a petition to terminate the trust was denied by the trial court in 1996, Robert appealed. Our opinion affirmed the holding of the trial court that the trust would continue to exist for a reasonable time until either all the assets were sold or a majority of the beneficiaries elected to terminate the trust. In so holding, we rejected Robert's contention that after December 31, 1974, any continuation of the existence of the trust required unanimity and, thus, if he as an individual beneficiary withdrew his consent the trust would automatically terminate. In rejecting that interpretation of the trust as unreasonable, we explained as follows: "The entire structure of the trust agreement discloses a commitment by each of the original settlors to give up his or her right, as an individual, to veto a sale or other disposition as part of the liquidation of the trust corpus. Thus, any such sale or disposition can be made upon majority approval of the beneficiaries. This provision would be totally meaningless if an individual beneficiary could instantaneously terminate the trust merely by withdrawal of his or her consent to its continuation; to avoid termination of the trust, any sale of corpus would need unanimous consent instead of majority approval."

**Our 2009 Opinion**

Our next opinion relating to the trust was issued 10 years later in *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328. As summarized at pages 1330–1333 of that opinion, in 2008 the sale of one of the trust's major assets, the 68,000-acre Onyx Ranch, was approved by a majority of the beneficiaries. The sale was challenged in the trial court by Robert and two other beneficiaries, and after a trial, the trial court ruled in favor

of the majority and ordered the sale of the ranch. The trial court also concluded that the objections to the sale by Robert and other objectors were not made in good faith, but had sought through meritless arguments to delay and disrupt the sale, thereby forcing the trustee to incur significant legal expenses. The trial court in that case awarded $226,000 in attorney fees and costs to the trustee and ordered such fees charged against the objectors' (including Robert's) future trust distributions. In so ruling, the trial court noted that it appeared "[the objectors] were either unwilling or incapable of understanding that they did not own the [trust] assets to the exclusion of the other beneficiaries. [The objectors] were partial owners who agreed many years ago that, in liquidating the [trust] assets, the majority of the beneficiaries would determine the conditions of such liquidation." (*Rudnick v. Rudnick*, *supra*, 179 Cal.App.4th 1328, 1333.) On appeal, we affirmed the trial court's order, including the court's finding of bad faith and the use of its discretionary equitable power to charge attorney fees incurred against the objectors' share of the trust estate. (*Id*. at pp. 1335–1336.)

**The 2010 Settlement Agreement**

A series of other challenges by Robert and another beneficiary resulted in additional attorney fee orders being entered against them and appeals and writs concerning said orders. While those matters were pending, and further attorney fee petitions were filed in the trial court by Oscar as trustee, the parties met and reached a global settlement. According to the trustee, the purpose of entering into the settlement was "to stop wasteful, vexatious, frivolous and bad faith litigation instituted by Philip Rudnick and Robert Rudnick," and through a compromise to "buy peace and to ultimately terminate this Trust without more unnecessary litigation."

The parties' settlement was memorialized in the 2010 settlement agreement (hereafter, the 2010 Settlement Agreement), executed on June 15, 2010. Section 3 of the 2010 Settlement Agreement established, for Oscar's protection as trustee, a litigation reserve of $1 million "for the purpose of defending him as Trustee of the [trust] from

claims made after the Execution Date [of the 2010 Settlement Agreement]."  Section 4 provided Oscar "may proceed to act for and on behalf of the [trust] as Trustee and to fulfill its purpose of liquidation of its assets as soon hereafter as is practicable, and, as soon as practicable, shall take reasonable steps to sell three remaining parcels of land owned by the [trust]," assuming that any such sales are approved by a majority of the beneficiaries.  Further, Robert Rudnick and the other objectors agreed "that Oscar is entitled to engage in the conduct identified herein" of liquidating assets, and they further agreed they would not "object to any such conduct by Oscar."  The 2010 Settlement Agreement also required, as a condition of enforceability, that Robert and Philip Rudnick enter a stipulation to have a pre-filing order entered against them under Code of Civil Procedure section 391.7 that they "will not directly or indirectly … file any litigation against Oscar Rudnick without first obtaining leave of the presiding judge of the court of the county wherein litigation is proposed to be filed and posting security for the benefit of the defendants as provided in … Code of Civil Procedure [section] 391.3."  Furthermore, as discussed herein, the 2010 Settlement Agreement contained an attorney fee provision.

In its order dated August 6, 2010, the trial court approved the 2010 Settlement Agreement.  In approving the settlement terms, the trial court included additional conditions in its order.  For example, in confirming that the trustee "shall attempt to sell the three remaining parcels of land that constitute the real property assets of the [trust] and all other [trust] assets as soon as practicable," the trial court's order added that the sale of the remaining assets shall be "*in no event later than one year from the Effective Date of the Settlement Agreement*."  (Italics added.)  That one-year period would conclude on June 15, 2011.  At which time, as stated in the trial court's August 6, 2010 order, "[t]he Trust will be terminated."

**Postsettlement Actions by Trustee**

Following the 2010 Settlement Agreement, Oscar sought to dispose of the remaining trust assets by valuing the properties and offering them for sale.  He attempted

7.

to sell real property parcels located in Barstow and Ridgecrest, but no acceptable offers were received. During this process, Oscar discovered that the trust had interests in oil, gas and other subsurface rights that may have value, some of which were never properly transferred from the 1937 trust. Oscar brought such mineral interests to the attention of the beneficiaries and was unanimously instructed to pursue these opportunities. In seeking to fulfill this charge, it was learned that a successor trustee of the 1937 trust would have to be appointed to cause the mineral rights to be transferred to the present trust. A ballot was sent to the beneficiaries explaining the situation and seeking their consent to have him appointed as successor trustee of the 1937 trust for this limited purpose. However, Robert and others refused to consent to the proposed plan. Oscar was forced to file a petition so that he could be appointed as successor trustee of the 1937 trust. Robert objected to Oscar's petition.

On March 21, 2012, the trial court issued its order granting Oscar's request and appointing him to act as successor trustee of the 1937 trust to cause the discovered mineral interests to be transferred to the present trust. By its 2012 order, the trial court implicitly, but necessarily, superseded its prior order that the present trust—the Rudnick Estates Trust—be liquidated and terminated by June 15, 2011. That is, the trust would obviously have to continue so that Oscar could resolve the matters relating to the mineral interests. As the trial court observed, "Oscar's compliance with [the 2012] order necessarily required him to continue the affairs of the [trust] well beyond the June 15, 2011 deadline because these mineral rights had to be liquidated in a reasonable and prudent manner. Robert Rudnick was well aware of this situation."

Oscar's efforts regarding the mineral interests apparently bore fruit. During the ensuing years, Oscar made further distributions to the beneficiaries, at their request, totaling $539,993.80. Robert cashed his distribution checks without objection.

Another unexpected development occurred during this same period. At the time of the 2010 Settlement Agreement, a gold mine in Keyesville, California, appeared to

have little more than land value.  Oscar discussed the matter with the beneficiaries and determined the mine should be appraised.  A consulting mine geologist was hired.  In 2013, after the mine geologist informed Oscar that the gold mine could possibly be worth $4.1 million, Oscar informed the beneficiaries of this new information.

According to Oscar's declaration in support of his proposed final distribution, the new information concerning the gold mine was significant and would prudently require a new approach in liquidating the trust.  "This [the gold mine's potential value] required a complete tactical shift as to disposing of this particular asset.  To sell it for land value with that potential gold mine value would be irresponsible.  I could not dispose of the asset to meet a deadline if that meant sacrificing significant value that belongs to the beneficiaries.  No beneficiary disagreed with this.  Indeed, those with whom I discussed this were adamant that I seek to exploit the full value of this asset, especially in a market when gold had appreciated.  This asset cannot be developed, in my view, within the structure of a Trust.  It requires investment by its owners in order to maximize it.  The [trust] is not a vehicle for raising money.  It is not a business, and development of a gold mine is a business.  Terminating the [t]rust could thus be accomplished not by a sale of this asset, but rather by a distribution of it to a business entity owned by the beneficiaries.  That tactical shift caused a substantial delay in termination, as a new entity had to be researched, the [e]xisting Mammoth Mountain Mining Company [the corporation having title to the mine, the shares of which were owned by the trust] had to be thoroughly investigated, and a mechanism had to be conceived by our lawyers that would comply with [the trust], Probate Law and Corporate Law."  After further investigation, it did not appear wise to use the Mammoth Mountain Mining Company as the vehicle for this purpose, since its records were antiquated and potentially incomplete.  After considering the available options, and in consultation with legal counsel, Oscar requested a new entity be formed, Rudnick Keyesville, LLC, to own and operate the gold mine, with the intent that proportional membership interests in Rudnick Keyesville, LLC, would be distributed

9.

to the beneficiaries. Under this proposal, the stock in the Mammoth Mountain Mining Company and other remaining trust assets would be transferred to Rudnick Keyesville, LLC.

Once the attorneys were able to draft the necessary legal documents relating to the Rudnick Keyesville, LLC, which process was delayed for several months due to health issues suffered by the attorney in charge of this process, Oscar was prepared to file his petition for final distribution and termination of trust.

**The Petition for Final Distribution and Termination of Trust**

On March 15, 2016, Oscar filed the "Final Account and Petition for Final Distribution and Termination of Trust," referred to herein as the petition. All beneficiaries were timely served with the petition. No timely written objections were ever received.

In the petition, in describing the proposed final distribution, Oscar preliminarily explained that (i) his good faith efforts to sell the remaining assets at a reasonable price were unsuccessful, and (ii) the prospect of distributing the remaining assets in kind to the multiple beneficiaries as tenants in common would be problematic since "such diverse and unrelated business assets … would be unwieldy and unnecessarily complicate the ultimate disposition of such assets, potentially permanently impairing alienation thereof" on the part of the beneficiaries. Further, Oscar noted that until such business assets could eventually be sold, "they would need to continue to be managed and holding them as joint tenants or tenants in common among the [trust] beneficiaries would not provide adequate centralized management" to be workable.[4]

---

[4] In addition to the gold mine and any other mining or mineral rights, it appears the remaining assets in the trust included, among other things, two sizable parcels of desert land (apparently the Barstow and Ridgecrest properties), some cemetery plots and a remaining cash reserve.

10.

As discussed above, as a pragmatic solution Oscar proposed in the petition to transfer the remaining assets in the trust to a newly-formed limited liability company (or LLC) and then to distribute membership interests in said LLC to the trust's beneficiaries in connection with the termination of the trust. Each beneficiary's membership interest in the LLC would be in a percentage identical to the beneficiary's corpus interest in the trust. The name of the LLC would be Rudnick Keyesville, LLC, and a copy of underlying legal documents to accomplish the proposed disposition were provided. Oscar explained this proposed disposition was reasonable and advantageous because business assets such as the gold mine would, by nature, require active management. He asserted that "distribution in such form will permit the Members of the limited liability company greater flexibility in management of the Remaining Trust Assets than would exist if distribution were made to the beneficiaries as tenants in common or joint tenants, and that the business of disposing or developing such assets is better governed by the provisions of the Corporations Code than the Probate Code."

**Robert's Written Objections**

In June 2016, Robert appeared at a hearing on the petition and sought to present oral objections. The trial court ordered him to submit his objections in writing on or before July 15, 2016. On August 30, 2016, Robert filed written objections to the petition contending that Oscar violated the 2010 Settlement Agreement and the court order approving the same by (i) depleting the cash litigation reserve and (ii) failing to terminate the trust by June 15, 2011. The written objections were not only untimely but were not in proper form because they were unverified. Robert offered to file amended objections with a verification. However, Robert had also failed to comply with the pre-filing order by first obtaining consent of the presiding judge and posting any security required. In an interim order, the trial court held that before it would decide on Robert's request to file amended verified objections, Robert "shall first apply for permission from the presiding judge of the Kern County Superior Court to file an objection in the present action and

11.

post a security bond." The trial court indicated that if Robert were granted permission to file his objections and if he posts any security required, the court would then grant Robert's request for leave to file the amended verified objections.

On January 11, 2017, the presiding judge of the superior court ruled that before he may proceed with his written objections, Robert "shall furnish security in the amount of $100,000.00 for the benefit of Oscar Rudnick, Trustee of the Rudnick Estates Trust, within 30 days of the date of this order." Robert complied by posting security (i.e., $100,000) with the superior court on February 9, 2017.

On July 26, 2017, Robert filed his amended written objections with verification, reiterating the same objections as before. Specifically, he objected that (i) Oscar failed to honor the litigation reserve provision contained in the 2010 Settlement Agreement and the August 6, 2010 court order approving the settlement, and (ii) Oscar breached his duty to terminate the trust by the June 15, 2011 deadline, as required by the August 6, 2010 court order. In alleging a failure to meet the termination deadline, Robert did not object to transferring property into the LLC as such, but asserted "[t]he proposed transfer of the remaining 3 parcels to the Rudnick Keyesville, LLC could have been done on June 15, 2011," which would have saved money. The trial court set an evidentiary hearing on such issues for September 8, 2017, but on that date Robert's counsel informed the court he was not ready to proceed because he had failed to conduct discovery. In its minute order following the September 8, 2017 hearing, the trial court set the matter for trial on December 11, 2017.[5]

---

[5] The trial court also granted Oscar's motion to strike a new petition filed by Robert against Oscar alleging breach of fiduciary duty. The trial court's rationale for striking the petition was that it was wholly duplicative to the matters set forth in Robert's amended objections.

**Timing Issue Resolved**

Oscar filed a declaration on September 30, 2016, responding to the contention that he should have terminated the trust by June 15, 2011 pursuant to the trial court's August 6, 2010 order (sometimes referred to as the timing issue). In his declaration, Oscar reiterates the unexpected developments that occurred after the trial court's August 6, 2010 order. Those developments included the discovery of extensive mineral interests, which the beneficiaries unanimously instructed him to pursue, and the need to be appointed as a successor trustee of the 1937 trust for the sole purpose of clearing title to some of the mineral interests by having them properly transferred into the present trust. In 2012, over Robert's objection, the trial court granted Oscar's petition to be appointed successor trustee of the 1937 trust for that purpose. As we have already noted herein, the trial court's 2012 order superseded its prior order that the trust be liquidated and terminated by June 15, 2011 because the trust would obviously have to continue so that Oscar could resolve the matters relating to the mineral interests. As the trial court subsequently found: "Oscar's compliance with [the 2012] order necessarily required him to continue the affairs of the [trust] well beyond the June 15, 2011 deadline because these mineral rights had to be liquidated in a reasonable and prudent manner. Robert Rudnick was well aware of this situation."

In response to Robert's objection based on the timing issue, one of the beneficiaries of the trust (i.e., RET Falk Holdings LLC, as successor to beneficiary Elynor Rudnick) filed a motion for judgment on the pleadings. The motion for judgment on the pleadings specifically challenged the legal viability of raising the timing issue as a matter of law. In essence, the motion asserted that the 2012 order superseded the deadline indicated in the prior court order, and since Robert did not appeal or otherwise challenge the 2012 order, he was barred from arguing otherwise. Oscar, as trustee, joined in the motion.

13.

Additionally, David Falk, on behalf of RET Falk Holdings LLC as a trust beneficiary having a 20 percent interest in the trust corpus, filed a declaration fully supporting Oscar's proposal for final distribution, and opposing Robert's objections. Falk's declaration states: "On behalf of RET Falk Holdings LLC, I oppose having the desert properties and mineral rights distributed by the [trust] directly to the beneficiaries, and am in favor of Oscar's [p]lan to place those properties in a limited liability company with the Mammoth Mountain Mining stock and any mining claims. Oscar's plan will allow for sources of funds from mineral leases, sales of properties and capital calls, to pay property taxes on the desert properties and the real property where the gold mine is located, to maintain the mining claims, and to pay other expenses. [¶] … Oscar's plan will also allow the properties and gold mine company to be held and managed as a whole rather than many undivided parts controlled by 12 different people. Having the interests held individually is problematic, given the track record of the Rudnicks of having many disagreements related to the [trust], the varying levels of involvement of the beneficiaries, and the fundamentally different objectives … related to the [trust] assets. I also think that it would be almost impossible to sell undivided fractional interests to third parties."

Prior to the hearing of the motion for judgment on the pleadings, Robert filed a notice of non-opposition to the motion. On December 1, 2017, the trial court issued its order granting the motion for judgment on the pleadings, resolving the timing issue. As the trial court explained in its ruling on the petition, "Robert never appealed the March [ ] 2012 Order and was therefore precluded from raising any objection to a delay in terminating the [trust] following this court proceeding. [¶] On December 1, 2017, the date set for the hearing on the Motion for Judgment on the Pleadings[,] Robert withdrew his objection and the motion was granted. In essence, Robert conceded the motion had merit and [he] had no plausible justification to oppose it!"

14.

**Robert Withdraws His Principal Written Objections**

On December 1, 2017, at the hearing on the motion for judgment on the pleadings, Oscar's counsel announced to the trial court that a stipulation had been reached wherein Robert, through his counsel, agreed to withdraw objections premised on alleged violation of the 2010 Settlement Agreement and the court's August 6, 2010 order approving the 2010 Settlement Agreement. Robert's withdrawal of objections included both the timing issue concerning termination of the trust, as well as any claim for damages relating to the trustee's purported failure to establish and maintain a $1 million litigation reserve. The stipulation also stated Robert reserved the right to present to the court evidence that reasonable cause existed for filing his objections in good faith, for purposes of opposing any motion for attorney fees sought against him. Further, the stipulation stated Robert has put the trustee on notice that Robert would seek to persuade the trial court not to approve the trustee's petition because "commingling of all remaining [trust] assets into the [Rudnick Keyesville, LLC] is not consistent with the purpose of the [trust] and is not in the best interests of the beneficiaries …."

**The Trial Court Grants Oscar's Petition**

On March 9, 2018, the trial court granted Oscar's petition in its entirety. In so holding, the trial court rejected Robert's argument that distributing and commingling the remaining trust assets into the Rudnick Keyesville, LLC was not in the best interest of the beneficiaries and/or was inconsistent with trust purposes. Robert's position was rejected by the court for several reasons, most of which centered on the fact that a majority of the beneficiaries approved of the proposed disposition of trust assets by virtue of their failure to object. On this point, the trial court agreed with Oscar's argument that, in light of two appellate court decisions embracing the majority-rule provision as controlling in the disposition or liquidation of the trust assets, Robert was barred by the law of the case from seeking to go against that principle. Further, the trial court indicated this outcome was also consistent with the purpose of the trust because, when the trust was created by

15.

the beneficiaries in 1965, "[t]hey all agreed that in any dispute involving the liquidation of [trust] assets the majority vote would control. The majority of the beneficiaries are in agreement with Oscar's Final Account and his proposal to distribute the assets in the manner proposed. Whether Robert believes his proposal is a better approach is of no consequence." Additionally, the trial court noted the reasonableness of the outcome proposed by Oscar, as contrasted to Robert's alternative suggestion to distribute the remaining assets in kind as tenants in common, since Robert's alternative would make the property "unsaleable"—a problem whose avoidance "[was] the precise reason the [trust] was created over fifty-three years ago!!"

The bulk of the trial court's order addressed the issue of Robert's *bad faith* in raising his written objections to the petition—in particular, the objections that Oscar failed to terminate the trust by June 15, 2011 and spent or misused the litigation cash reserve. The trial court was very familiar with the entire history of the case, and of Robert's litigious tendencies that have resulted in extensive delays and expenses to the trust. The trial court's ruling extensively documented that history.

The trial court then evaluated Robert's written objections to the petition. In light of the fact Robert suddenly withdrew his written objections 10 days prior to trial, the trial court made an assessment of whether this occurred because Robert had discovered the relevant facts for the first time, or, whether he had known the relevant information all along. Relying on Oscar's declaration filed in September 2016, which described the activities Oscar engaged in as trustee during the applicable time frame, the trial court found that Robert was "fully aware" of the trustee's actions and the reasons for them "as they were occurring and long before he filed his verified Amended Objection." This would have included the circumstances of why the trust did not terminate earlier (including pursuit of mineral interests that benefited the beneficiaries), and of the trustee's need to incur legal expenses to address Robert's many objections, as well as the trustee's decisions to make distributions to beneficiaries or pay for other matters that

16.

were reasonably necessary to carry out the trust, but which required the expenditure of cash reserves. Because Robert was found to be fully aware of such facts all along, as they were occurring, the trial court concluded the objections were made in bad faith: "The fact Robert withdrew his objections and waived any right to rebut Oscar's Petition ten (10) days before trial causes this Court to conclude Robert was not acting in good faith."

Robert timely filed a notice of appeal from the trial court's March 2018 order granting the petition. As noted, this was the separate appeal we recently decided in *Rudnick v. Rudnick*, *supra*, F077613.

## B. The Motion for Attorney Fees

On October 4, 2018, while Robert's appeal from the order granting the petition was still pending, Oscar made a motion in the trial court for an award of attorney fees and costs against Robert, relating solely to fees and costs incurred by Oscar as trustee in having to respond to Robert's bad faith objections. The motion sought an award of over $314,000 in attorney fees and costs, plus the cost of bringing the motion itself, and requested that such fees and costs be paid by Robert from the $100,000 surety bond he was required to deposit with the court for such purposes, and that the remainder be charged against Robert's interest in the trust and future trust distributions, or if these sources were insufficient, against Robert personally.

Oscar's motion for attorney fees and costs was initially based on (i) Probate Code section 17211, subdivision (a), which authorizes an award of attorney fees and costs against a beneficiary who contests the trustee's account in bad faith and without reasonable cause, and (ii) the trial court's inherent equitable power over trusts, which includes the court's power to award attorney fees and costs against the share of a beneficiary making an unfounded contest to the trustee's actions (see *Rudnick v. Rudnick*, *supra*, 179 Cal.App.4th 1328, 1333–1335). In Oscar's reply brief and at oral argument, Oscar raised additional or alternative grounds upon which attorney fees could be

17.

awarded, including contractual attorney fees under the terms of the 2010 Settlement Agreement and Probate Code section 1310. The trial court allowed the parties an opportunity to file supplemental briefing to address the new arguments. The parties availed themselves of that opportunity, as supplemental and reply briefs were served and filed, although Robert elected not to address the contractual basis for attorney fees.

On January 7, 2019, the trial court issued its minute order granting Oscar's motion for attorney fees and costs based on the following legal grounds: (1) Probate Code section 17211, subdivision (a), because Robert's objections to the petition were made in bad faith and without reasonable cause; (2) the contractual attorney fee provision in the 2010 Settlement Agreement that entitled Oscar, as the prevailing party, to reasonable attorney fees and costs; and (3) Probate Code section 1310, subdivision (b), premised on need to prevent property loss or injury. The trial court deferred ruling on the amount of attorney fees until further information was submitted on that matter. Thereafter, on March 14, 2019, the trial court issued a final written order granting Oscar's motion for attorney fees and costs. Pursuant to the order, Oscar as trustee was awarded a total of $285,363.10 in attorney fees plus $5,167.52 in costs against Robert. The fees and costs were ordered payable by Robert first out of his $100,000 surety bond on file with the trial court, then from Robert's corpus interest in the trust and future trust distributions, and finally, as to any remaining amount due, Robert would be personally liable.

On April 9, 2019, Robert filed a timely notice of appeal from the March 14, 2019, order granting attorney fees and costs.

## C. We Affirmed the Trial Court's Order on Petition

As noted, we recently decided the separate appeal from the order granting the petition. In our nonpublished opinion in that matter, we affirmed the trial court's order granting the petition filed by Oscar as trustee for the final distribution and termination of the trust, and our affirmance thereof also included the trial court's finding that Robert's

objections to the petition were asserted in bad faith. (See *Rudnick v. Rudnick*, *supra*, F077613.)

**DISCUSSION**

## I. Standard of Review

Robert's appeal contends (i) the trial court lacked jurisdiction to rule on the attorney fee motion, and (ii) there was no legal authority upon which to base the attorney fee award.

Although a trial court's ruling to grant an award of attorney fees is ordinarily reviewed under the abuse of discretion standard, the determination of whether the trial court had authority to make an attorney fee award is a question of law we review de novo (*Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 460), including the issue of whether a trial court retained jurisdiction to rule on a motion for attorney fees after an appeal from the underlying judgment or order has been filed. (*Id.* at pp. 460–461.) Additionally, the question of whether reasonable cause existed to file a contest or objection to a trustee's account, under facts then known, constitutes an issue of law that is also subject to our independent review. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 927.)

## II. The Trial Court Had Jurisdiction to Rule on the Attorney Fee Motion

Robert contends the trial court lacked jurisdiction to rule on the motion for attorney fees and costs because, once he filed his appeal from the trial court's order granting the petition, the proceedings in the trial court relating to attorney fees were stayed under Code of Civil Procedure section 916. We disagree.

Generally, "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) The purpose of the statute's automatic stay provision

19.

is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided; that is, it prevents the trial court from rendering the appeal futile by altering the appealed judgment or order by conducting proceedings that may affect it. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 (*Varian*).) To accomplish this purpose, Code of Civil Procedure section 916 subdivision (a) stays all further trial court proceedings upon the matters embraced in or affected by the appeal. (*Varian*, at p. 189.) In determining whether postjudgment or postorder proceedings in the trial court are upon matters embraced in or affected by the appeal, the test is whether such proceedings would have any impact on the " 'effectiveness' of the appeal." (*Ibid.*) "If so, the proceedings are stayed; if not, the proceedings are permitted." (*Betz v. Pankow* (1993) 16 Cal.App.4th 931, 938.)

Consistent with the above principles, it is well established that a trial court retains jurisdiction to award attorney fees despite the filing of a notice of appeal from a judgment or a final order in the case. (*Bankes v. Lucas* (1992) 9 Cal.App.4th 365, 368; *Nazemi v. Tseng* (1992) 5 Cal.App.4th 1633, 1639; *Hoover Community Hotel Development Corp. v. Thomson* (1985) 168 Cal.App.3d 485, 487.) Thus, a trial court is not precluded by the automatic stay from ruling on a postjudgment or postorder motion for attorney fees and costs. (*Bankes v. Lucas*, *supra*, 9 Cal.App.4th at pp. 368–369 [noting that this was the case even though the prevailing party at the trial may not be the prevailing party after the appeal].)[6]

The same rule allowing a motion for attorney fees to proceed will be followed even where, as here, the motion for attorney fees includes factors besides a simple

---

[6]    As explained further by the Supreme Court in *Varian*, the fact that the postjudgment proceedings may render the appeal moot is not enough, by itself, to establish that the proceedings impact the effectiveness of the appeal and should be stayed under Code of Civil Procedure section 916: "[S]omething more is needed. For example, the trial court proceeding must directly or indirectly seek to 'enforce, vacate or modify [the] appealed judgment or order.' " (*Varian*, *supra*, 35 Cal.4th at pp. 189–190.)

20.

determination of which party ultimately prevailed in the action; e.g., where bad faith or lack of merit is considered by the trial court in connection with the fee motion. (See, e.g., *Silver v. Gold* (1989) 211 Cal.App.3d 17, 26 [fees as sanctions properly awarded after appeal filed]; *Doe v. Luster* (2006) 145 Cal.App.4th 139, 143–144 [statutory fees may be awarded by trial court under Code Civ. Proc., § 425.16, subd. (c), after appeal has been filed, including where the fee motion is based on whether a frivolous or dilatory motion was made by the defendant]; see also *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 360–361 [trial court may award fees under Code Civ. Proc., § 425.16, subd. (c), after appeal filed].)

Furthermore, the pendency of an appeal does not divest the trial court of jurisdiction to determine ancillary or collateral matters which do not affect the judgment or order appealed from. (*Betz v. Pankow*, *supra*, 16 Cal.App.4th at p. 938.) In this regard, a motion for attorney fees is recognized to be a collateral or ancillary matter to the main cause from which an appeal was taken. (*Bankes v. Lucas*, *supra*, 9 Cal.App.4th 365, 369; *Hoover Community Hotel Development Corp. v. Thomson*, *supra*, 168 Cal.App.3d 485, 487; *In re Marriage of Sherman* (1984) 162 Cal.App.3d 1132, 1140.)

Here, when Oscar's motion for attorney fees and costs was filed in the trial court, Robert's appeal from the order granting the petition was still pending. Nevertheless, under the above legal principles and case authority, we readily conclude the trial court had jurisdiction to hear and decide the motion; that is, the automatic stay of proceedings as set forth in Code of Civil Procedure section 916 did not apply to Oscar's motion for attorney fees and costs. That is so because the trial court proceedings relating to attorney fees and costs had no effect upon, nor did they in any way impair, the effectiveness of our ability to resolve the appeal of the order granting the petition. Additionally, the motion for fees and costs was a collateral matter to the relief of granting of the underlying main petition.

21.

Our conclusion would be the same whether we were considering the *contractual* basis for attorney fees in which Oscar was found to be the prevailing party under the attorney fee provision of the 2010 Settlement Agreement, or alternatively, one of the *statutory* bases for attorney fees such as Probate Code section 17211, which was premised on findings of Robert's bad faith and lack of reasonable cause. All such proceedings in the trial court relating to attorney fees simply had no bearing on the effectiveness of the then pending appeal concerning the petition itself. Although the order granting the petition—i.e., the order upon which the former appeal was pending— did include a finding on Robert's bad faith, we note that when the trial court subsequently addressed Oscar's motion for attorney fees and costs, it essentially treated the issue of bad faith anew and expressly reiterated and confirmed the reasons for that finding. In any event, inasmuch as the issue of bad faith was an *attorney fee* issue, and the trial court's proceedings on attorney fees were collateral to the order granting the petition itself and did not affect the effectiveness of our ability to review the same, the trial court clearly had jurisdiction to rule on the attorney fee motion and the stay did not apply.

For all these reasons, we conclude that Robert's jurisdictional challenge to the trial court's attorney fee order is without merit.

## III. Attorney Fees Properly Awarded Pursuant to Contract

The trial court found multiple legal grounds for awarding attorney fees, one of which was the parties' written contract—the 2010 Settlement Agreement. There is no dispute that, in principle, attorney fees may be awarded pursuant to contract. (See Code Civ. Proc., § 1033.5, subd. (a)(10); see also Civ. Code, § 1717.) Oscar argues this provided a sufficient legal basis to support the attorney fee award. We agree.

As we have detailed hereinabove, the 2010 Settlement Agreement was entered by Oscar to stop Robert's wasteful, frivolous and bad faith litigation concerning the trust. To protect Oscar as trustee from such litigation, the 2010 Settlement Agreement provided for establishing a litigation reserve of $1 million. Further, it was agreed that Oscar would

take steps to liquidate the trust's remaining assets as soon as reasonably practicable, and Robert would refrain from making objections to such conduct. In fact, the 2010 Settlement Agreement required Robert to stipulate to imposition of a pre-filing order against him under Code of Civil Procedure section 391.7, which of course is one of the statutory remedies against vexatious litigants. In its approval and implementation of the 2010 Settlement Agreement, the trial court added a one-year deadline—i.e., to June 15, 2011—to liquidate the assets and terminate the trust.

The 2010 Settlement Agreement contained the following provision for the recovery of attorney fees and costs to the prevailing party: "If either party to this Agreement shall bring any action, suit, counterclaim, appeal, arbitration, or mediation for any relief against the other, declaratory or otherwise, to enforce the terms hereof or to declare rights hereunder…, the losing party shall pay to the prevailing party all sums for attorneys' fees and costs … actually billed and incurred" in the litigation.

Here, Robert filed written claims objecting to and opposing the petition, contending that Oscar had breached the 2010 Settlement Agreement and order implementing the same by (i) not terminating the trust in a timely fashion by the June 15, 2011 deadline, and (ii) failing to comply with the litigation reserve provision. Robert's claims and/or objections under the 2010 Settlement Agreement made it necessary for Oscar as trustee to incur attorney fees and costs to defend his actions as trustee. Within only a few days of the commencement of trial, Robert suddenly and without explanation reversed his position and withdrew these principal objections.

The trial court ultimately granted the petition, and, in its order on the subsequent attorney fee motion, the court found Oscar to be the prevailing party for purposes of the 2010 Settlement Agreement attorney fee provision. That prevailing party determination is not challenged, and, in any event, it is clearly correct. Further, although the initial moving papers did not originally mention the 2010 Settlement Agreement as one of the

grounds for attorney fees, it was explicitly raised at oral argument and the trial court allowed the parties an opportunity to provide supplemental briefing on the issue.

Robert's main argument on appeal is that the motion for contractual attorney fees was untimely under California Rules of Court, rule 3.1702. However, Robert's argument is clearly misplaced because the time limit of rule 3.1702 is not applicable to petitions for attorney fees in probate proceedings. (7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 301, p. 898; *Hollaway v. Edwards* (1998) 68 Cal.App.4th 94, 97–99 [former timing provision, Cal. Rules of Court, rule 870.2, now Cal. Rules of Court, rule 3.1702, held not applicable in probate trust proceedings relating to attorney fees].)[7] This is partly because of differences between probate/trust matters and ordinary civil judgments with respect to the rendition of final judgments and other attorney fee considerations, and also because of the broad equitable powers enjoyed by a probate court concerning trusts, including as to attorney fees. (*Hollaway v. Edwards*, *supra*, 68 Cal.App.4th at pp. 98–99.) We therefore reject Robert's claim the attorney fee request was untimely filed.

Finally, Robert argues that a portion of the attorney fees incurred would have concerned issues unrelated to the 2010 Settlement Agreement—for example, his disagreement about the wisdom or propriety of creating an LLC. We reject this argument as waived or forfeited. Robert did not adequately raise such apportionment issues at the hearing of the attorney fee motion or, more importantly, when the trial court gave him the opportunity to file supplemental briefing. " ' "It is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." Thus, "we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the

---

**7** In 2007, former California Rules of Court, rule 870.2 was renumbered as rule 3.1702, but the substance of the rule remained the same. (See *Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1505, fn. 3; cf. *Hollaway v. Edwards*, *supra*, 68 Cal.App.4th at p. 97, fn. 2.)

24.

first time on appeal which were not litigated in the trial court are waived. [Citations.]" ' [Citation.]" (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399; accord, *Gonzalez v. County of Los Angeles* (2004) 122 Cal.App.4th 1124, 1131; *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11.)

On the record and circumstances before us, we conclude under the foregoing analysis that the 2010 Settlement Agreement provided adequate grounds in this case to support the trial court's order awarding attorney fees and costs to Oscar as trustee.

## IV. Attorney Fees Properly Awarded under Probate Code Section 17211

Another of the multiple legal grounds relied on by the trial court in granting Oscar's motion for attorney fees and costs was Probate Code section 17211, subdivision (a) (hereafter section 17211(a)). Robert's appeal contends the trial court erred in holding the statutory elements for granting an attorney fee award were met. As explained below, we disagree and conclude section 17211(a) furnished an alternative supporting ground for the trial court's order.

Probate Code section 17211(a) provides in relevant part: "If a beneficiary contests the trustee's account and the court determines that the contest was without reasonable cause and in bad faith, the court may award against the contestant the compensation and costs of the trustee and other expenses and costs of litigation, including attorney's fees, incurred to defend the account." Thus, the statute requires both lack of reasonable cause and bad faith. The two elements are distinct. "Reasonable cause is evaluated under an objective standard of whether any reasonable person would have tenably filed and maintained the objection." (*Powell v. Tagami* (2018) 26 Cal.App.5th 219, 234.) On the other hand, "[b]ad faith involves a subjective determination of the contesting party's state of mind—specifically, whether he or she acted with an improper purpose." (*Ibid*.) Bad faith may be, and often is, inferred from the circumstances: " 'Good faith, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursing it?

25.

A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence.' [Citation.]" (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263, italics omitted.) In short, an action or tactic may be found to be in bad faith if, under the circumstances, the trial court may reasonably infer that it was pursued for an improper purpose, such as to cause unnecessary delay or to harass the opposing side. (*Ibid.*)

## A. <u>Statutory Element of Bad Faith Established</u>

As to the element of "bad faith" under Probate Code section 17211(a), the trial court found on the record before it that Robert's objections were made in bad faith, and we affirmed that conclusion in our opinion deciding the separate appeal in *Rudnick v. Rudnick*, *supra*, F077613. As we explained in that opinion on the issue of Robert's bad faith:

> "Here, in concluding the objections were made in bad faith, the trial court focused on the fact that Robert, after having opposed the petition 'at every turn' 'for nearly two years' through his steadfast objections that Oscar breached the 2010 Settlement Agreement and the order approving same by (i) not terminating the trust by the June 15, 2011 deadline, and (ii) failing to comply with the litigation reserve provision, Robert suddenly reversed his position and withdrew these principal objections only a few days before the hearing on the merits. In light of Robert's abrupt abandonment of his main objections on the eve of trial, the trial court made a factual assessment of whether this occurred because Robert had learned or discovered the relevant facts for the first time, or, conversely, whether he had known the relevant information all along.

> "Relying on Oscar's declaration filed in September 2016, which described the activities Oscar engaged in as trustee during the relevant period, the trial court found that Robert was 'fully aware' of the trustee's actions and the reasons for them 'as they were occurring and long before he filed his verified Amended Objection.' This would have included the circumstances indicating why the trust did not terminate earlier (including the court-approved pursuit of mineral interests), and the trustee's need to incur legal expenses to address Robert's many objections. It also would have included the trustee's decisions to make distributions to beneficiaries or pay for other matters that were reasonably necessary to carry out the

trust, but which required the expenditure of cash reserves. Because Robert was found to be fully aware of such facts all along, as they were occurring, the trial court concluded the objections were made in bad faith: 'The fact Robert withdrew his objections and waived any right to rebut Oscar's Petition ten (10) days before trial causes this Court to conclude Robert was not acting in good faith.'

"We discern no error. Based on the timing of Robert's withdrawal of his principal objections without any adequate explanation, and the detailed history of the relevant events undertaken by the trustee that would have been fully known by Robert all along (as set forth in Oscar's supporting declaration), we conclude there was substantial evidence in the record to support the trial court's finding that Robert's objections were interposed in bad faith. If, as the trial court properly found, Robert had always known the facts which warranted the withdrawal of his objections, it may reasonably be inferred that he interjected and maintained those objections for improper purposes, such as to vex, delay or obstruct the proceedings. For these reasons, the trial court's finding of bad faith is affirmed."

Our opinion in the prior appeal is final. Therefore, the issue of Robert's bad faith is established.

## B. <u>Statutory Element of Lack of Reasonable Cause Supported by the Record</u>

Robert's appeal challenges the trial court's conclusion that his objections to the trustee's petition were made without reasonable cause. He asserts that if the trial court had correctly applied the objective standard for determining reasonable cause, Robert's objections would have been deemed reasonable and not sanctionable under Probate Code section 17211(a). We disagree with Robert's assertion, for the reasons explained below.

As noted, the question of whether reasonable cause exists "is evaluated under an objective standard of whether any reasonable person would have tenably filed and maintained the objection." (*Powell v. Tagami*, *supra*, 26 Cal.App.5th at p. 234, citing *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th 866, 926–927 [reasonable cause standard is ordinarily synonymous with probable cause standard used for malicious prosecution].) Reasonable cause is determined in light of the facts known to the party in question at the time the contest was initiated or maintained by him or her. (*Uzyel v. Kadisha*, *supra*, 188

27.

Cal.App.4th at pp. 926–927.)  If there is no dispute as to what facts were known at the time the contest was initiated or maintained, the existence of reasonable cause is a question of law.  (*Powell v. Tagami*, *supra*, 26 Cal.App.5th at p. 234.)  Any underlying factual questions in this regard—e.g., what the objector knew at the time of initiating or maintaining his claim—are for the trial court to resolve.  (*Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 927.)

In its order granting attorney fees, the trial court's discussion of lack of reasonable cause overlapped with that of bad faith; that is, for the most part the two elements of Probate Code section 17211(a) were considered together.  However, the order granting attorney fees also reflected the trial court's reliance on the relevant factual history and findings set forth in its 2018 order granting the petition (the 2018 order), and the court declared that the 2018 order "supports a finding" of lack of "reasonable cause."  Read in this light, it appears the trial court reached its conclusion that Robert did not have reasonable cause because Robert was aware, long before he made his objections, that they were meritless or unfounded under the facts known to him.  In other words, it was not merely that Robert abandoned his objections without explanation on the eve of trial— as telling as that was—but also that Robert had *knowledge* all along of the relevant facts indicating that his objections were unsupported and could not prevail.

We believe the element of lack of reasonable cause as found by the trial court may be confirmed by examining each of Robert's main objections individually.  We undertake that individual analysis in the discussion which follows.

The *first* of Robert's principal objections was that Oscar failed to terminate the trust and distribute all the remaining trust assets by the June 2011 deadline.  Robert asserted this objection in 2016 and persisted in maintaining it unrelentingly until he suddenly withdrew it without explanation a few days before trial.  However, the objection was clearly meritless from the start because, as the trial court found, Robert knew that in 2012 a new order was issued by the trial court for Oscar to pursue certain mineral rights

and cause them to be transferred to the trust. Those mineral rights, once transferred to the trust, would also have to be evaluated and decisions would have to be made by the trustee and approved by the beneficiaries to accomplish a reasonably prudent distribution or disposition thereof. All of that would take considerable time to resolve, as Robert knew. In short, it was obvious to all concerned that the 2012 order necessarily superseded the 2011 deadline and extended the duration of the trust. As the trial court correctly found based on this record, "Oscar's compliance with [the 2012] order necessarily required him to continue the affairs of the [trust] well beyond the June 15, 2011 deadline because these mineral rights had to be liquidated in a reasonable and prudent manner. Robert Rudnick was well aware of this situation."

Additionally, as further observed by the trial court, Robert's own conduct contributed to any delay in the process by (i) objecting to Oscar's proposal that he (Oscar) be appointed temporary trustee of the 1937 trust to cause the mineral rights to be perfected and transferred into the current trust, which pointless objection required Oscar to seek approval by a petition to the trial court (as was granted in the 2012 order), and (ii) insisting that Oscar take certain steps to enhance the value of the mineral rights mentioned above.

In summary, as the trial court found based on the record, Robert understood the above facts and their significance when he interposed his frivolous objection that the trustee failed to meet the obsolete 2011 deadline. Accordingly, the court correctly held that Robert's objection to the petition on this ground was altogether without merit and unfounded, and Robert "knew this" to be the case long before he filed the objection. We conclude this objection was made without reasonable cause.

The *second* of Robert's principal objections was that Oscar failed to segregate and maintain a $1 million litigation reserve. The litigation reserve was provided for under the 2010 Settlement Agreement as a means of protecting Oscar from the costs and expenses of having to defend future claims against him as trustee of the trust. From the context of

the agreement, it is apparent that a major purpose of the litigation reserve was to provide a hedge of protection against Robert's litigious propensity to file unnecessary objections. Other similar protections were built into the 2010 Settlement Agreement, including Robert's express promise to refrain from objecting to the trustee's subsequent actions in pursing the liquidation of the remaining trust assets, as well as a provision to impose what plainly amounted to a vexatious litigant pre-filing order against Robert. As Oscar stated and the agreement itself reflected, the purpose of entering into the settlement was "to stop wasteful, vexatious, frivolous and bad faith litigation instituted by Philip Rudnick and Robert Rudnick," and through a compromise to "buy peace and to ultimately terminate this Trust without more unnecessary litigation."

Although the litigation reserve was for Oscar's benefit, it appears that Oscar, in fulfilling his fiduciary responsibilities as trustee, had to choose at various times whether other priorities before him as trustee were more important than holding back a large cash reserve to protect himself from Robert's attacks. Oscar did choose to reduce the cash reserves at times, but he did so for legitimate trust purposes, and, as shown below, Robert knew that to be the case. As we have noted, the trial court concluded that this objection was not only in bad faith but was lacking in reasonable cause. The court stated that Robert's last minute withdrawal of the objection supported an inference that Robert had no factual support for his claim. More than that, however, the trial court relied on the findings contained in its 2018 order granting the petition, which order had addressed Robert's knowledge.

In its 2018 order granting the petition, the trial court made extensive and detailed findings of what Robert knew *prior to* the filing of his objections, including knowledge of the trustee's actions and the reasons for them as they occurred, all of which would have entailed necessary or proper expenditures of funds from the trust reserves during the time period in question. These actions of the trustee which impacted the total cash reserves of the trust (i.e., reducing the litigation reserve) included such matters as making

30.

proper distributions to beneficiaries from time to time upon request or based on need, hiring appraisers, hiring professional services for the development, sale and/or negotiation of leases regarding the various mineral holdings, paying legal counsel to research and ascertain a prudent course of action, including the preparation of necessary documents, to responsibly handle and transfer the gold mine to preserve its potential value to the beneficiaries, as well as paying legal costs associated with addressing Robert's objections or opposition along the way. As the trial court found, "it is clear that Robert was fully aware of these activities as they were occurring," which was "long before" he filed his objections to the petition.

Not only did Robert know all along of the activities necessitating the expenditures by the trustee which reduced the available cash reserves, but the trial court additionally noted that audited financial statements concerning the trust were sent by Oscar as trustee to the beneficiaries in 2010, 2011, 2012, 2013 and 2014 and no beneficiaries, including Robert, ever objected to the content or accuracy of those reports. Under these facts, the trial court indicated that any purported "shock" expressed by Robert in connection with his objection that the trust's cash or litigation reserve had been diminished was obviously not in good faith or genuine, but was yet another pretext for more needless litigation.

We agree with the trial court that Robert lacked reasonable cause to pursue the objection relating to the litigation reserve. A permutation of Robert's argument was apparently that since Oscar made decisions which ultimately reduced the litigation reserve, this might conceivably mean Oscar mismanaged the trust in some fashion. However, according to the trial court's factual findings, Robert knew otherwise based on his extensive level of knowledge of the trustee's activities during the time frame in question. As the trial court found in the 2018 order, Robert was not only aware of these activities and the reasons for them as they occurred, but he received without raising objections the annual financial statements from year to year concerning the trust. Since Robert knew full well of the unexpected developments that arose after the 2010

31.

Settlement Agreement and was fully apprised of Oscar's reasonable actions in response thereto to carry out his duties as trustee, it appears that Robert's objection concerning the litigation reserve was wholly unfounded. On the record before us, we therefore agree with the trial court's conclusion that Robert lacked objective reasonable cause to assert this objection.

The *third* objection to the petition related to Robert's concern with the trustee's proposal to use an LLC with respect to distribution of the gold mine and other remaining assets and/or commingling assets in one entity. This objection was not timely made but was raised for the first time shortly before trial. More importantly, it was plainly meritless because of the dispositive legal effect of the majority-rule provision of the trust. The trial court noted that, here, a majority of the beneficiaries had clearly approved of the proposal for final distribution contained in the petition by virtue of their failure to object after receiving notice of the petition, which should have finally settled the matter. Unfortunately, however, as in prior cases Robert again failed to recognize the impact of the trust's unequivocal majority-rule provision.

Finally, in granting the motion for attorney fees, the trial court was not persuaded by Robert's argument to the effect that he had reasonable cause since he had obtained attorney declarations in support of the filing of his objections to the petition. The attorney declarations were apparently offered to overcome the pre-filing order, and were fairly sparse in content. The trial court concluded that it did not appear Robert had fully disclosed all the relevant facts to those attorneys, including for example the subsequent 2012 order extending the trust's duration. Had such relevant information been disclosed, the trial court believed the declarations would not have supported Robert's objections. We agree with the trial court's assessment that it does not appear the attorneys who initially supported Robert's objections were apprised of all the relevant facts, and Robert has not demonstrated any error in the trial court's finding or reasoning.

We conclude the trial court properly held that Oscar was entitled to an award of attorney fees under Probate Code section 17211(a). In so concluding, we note that even assuming for the sake of argument that we were mistaken as to the lack of reasonable cause regarding any one or more of the objections raised by Robert, the *contractual* basis for attorney fees—as previously discussed hereinabove—would still provide a sufficient basis to affirm the order of the trial court.

## V. Equitable Power Relating to Trusts Supported Attorney Fee Order

One of the grounds raised by Oscar's motion for attorney fees was the inherent equitable power of the trial court, when sitting in probate, relating to trusts. Although the trial court did not explicitly mention this rationale, we believe that implicit in the trial court's order granting attorney fees was a pervasive rationale that weighty equitable considerations warranted the allowance of attorney fees in this case. In reviewing this matter de novo, we conclude this equitable ground supports the trial court's order, as explained below.

As we have recognized in a prior appeal in this same case, a probate court maintains broad equitable powers over trusts, such that "when a trust beneficiary instigates an unfounded proceeding against the trust in bad faith, a probate court has the equitable power to charge the reasonable and necessary fees incurred by the trustee in opposing the proceeding against that beneficiary's share of the trust estate." (*Rudnick v. Rudnick*, *supra*, 179 Cal.App.4th 1328, 1335.) In that 2009 matter, Robert and two other beneficiaries had opposed a petition to consummate the sale of the Onyx Ranch, even though the sale was approved by a majority of the beneficiaries. The trial court granted the trustee's petition to conclude the sale, but held it would be unfair to burden the entire trust or the majority of the beneficiaries with the considerable attorney fee expense of having to respond to the bad faith opposition to the petition made by Robert and two others. Therefore, under the court's broad equitable powers regarding trusts, the attorney

fees involved were made chargeable to Robert's share in the trust estate. (*Id*. at pp. 1332–1335.) We affirmed. (*Id*. at p. 1336.)

Under the same principles, we conclude in the present case the trial court was well within its broad equitable powers to shift the burden of the attorney fees and costs incurred by Oscar as trustee, in having to respond to Robert's bad faith and unfounded objections to the petition, to Robert's share of the trust. Thus, these equitable powers concerning trusts provided an additional or alternative ground of legal support for the trial court's attorney fee order in this case.

In conclusion, we have shown that the trial court had jurisdiction to hear the attorney fee motion and at least three distinct legal bases were sufficient to allow the trial court to properly award attorney fees and costs. As such, it is unnecessary to reach the merits of the additional statutory grounds for attorney fees argued by the parties.

## DISPOSITION

The order of the trial court is affirmed. Oscar is awarded costs on appeal.


LEVY, Acting P.J.

WE CONCUR:


POOCHIGIAN, J.


SNAUFFER, J.

34.